I don't know if I'm ever ready, Your Honor, but thank you. Thank you for the opportunity to appear here today. I appreciate the chance to talk about the case. Anything, any questions you have, I'd be happy to answer. And thank you for appearing from Seattle. I appreciate your taking the time. My pleasure. My basic theme is the same theme that was in the briefing, is that under the rules for handling a summary judgment motion, the district judge failed to take all reasonable inferences in favor of Cortez and was weighing credibility and was weighing the evidence, failed to take all reasonable inferences in favor of Cortez, and because of that, the summary judgment was improperly granted. The magistrate judge, I believe, got things pretty well. And I know there's no automatic rule that if there's a split between the magistrate judge and the district judge that there are genuine issues of material fact, but it does give a separate discussion of the same sorts of things and reaching separate conclusions based on the same facts. And that ought to give us, as I said in the brief, a little bit of a pause. This case depends so much on the facts that, you know, as an appellate lawyer, I feel I have so many facts buzzing in my head, and in this case in particular, because every time I seem to look at a major fact or a major consideration of the case, there's some contrary or conflicting fact or consideration. I'm going, well, how do you decide this as a judge? And I think as a judge, you really can't decide this. You really need to let the jury work its way through. It comes from beginning to end. Counsel, I have a question that's a theory question. If we were to decide, in part contrary to your argument, that there wasn't a fact issue on deliberate indifference, but we thought there was a fact issue on gross negligence, what would then happen? Would the district court have to keep the negligence claim, or could that go elsewhere? I believe it could be remanded to the state court. You're just talking about state law issues at that time. So I believe that's where it would go. That would just be up to the district court if we did that, right? Yes, Your Honor. I understand there's such a thing as pendant jurisdiction. I heard about it in law school, and I think the district judge would be interested in it. They called it when I was in law school, too, pendant. But now they call it supplemental, I think. Okay. Thank you, Judge. Well, you start the problems with the facts start with the officer who was doing the transmitting school. And he says, well, at one point he says two was the most inmates that one correctional officer should escort. But he's escorting three. And so he says, well, it's okay to do three. Although he, in other places, he said, well, you should never do three with one officer. Then he says, well, I didn't know that there was any sort of animosity. But counter that, there was some evidence that there was animosity. There were words and whatnot that were being spoken in the area as the prisoners were getting ready to depart. Let me ask you this. Do you think that it ends up being critical for purposes of your client surviving summary judgment that there be a factual dispute as to what he knew about these particular inmates and the potential for a clash between or among them? I don't know about critical, but I think it's very well, I don't know if I'm quibbling on adjectives and adverbs, but I think it's critically important. Let's say for your deliberate indifference claim. I mean, the officer has to be subjectively aware, right? Right. And so if anything, I would think the three to one, two to one, whatever that is, from the officer's standpoint, it's about his safety. I'm sure that's why it would be hard to infer that Officer Skoll violated whatever this two to one, three to one policy, thinking that he was going to put himself at risk, right? Especially when you're going in an area where there's no cameras and it's going to be hard to get people to come help you. So it seems to me, I ended up thinking it was probably critical for your case to survive summary judgment on the deliberate indifference claim that the officer have had at least some incline that, hey, these guys should not be together because of their status. One is in protective custody, the other is, you know, some gang affiliate or whatever, and that maybe they were arguing before. So maybe you can focus on that point, at least for my purposes, and explain why there's a factual dispute there. Well, I think part of what Skoll is worried about is his personal safety, but I think necessarily the jury could assume he's also worried about what's going to happen with the inmates themselves. If he can't keep control of them, of course he's placed in danger, but they're placed in danger as well. There was some evidence that there was a dispute in animosity. All the inmates in this particular unit, it's called the security threat group, all of them are problems in one way or the other, and oddly enough, some of them are protective segregation or heading into protective segregation. So you've got groups that are highly volatile. Sergeant Hawthorne said there's really permission when you're dealing with protected custody kind of inmates for the other inmates to attack them. In the culture of this particular prison, whether they're Mexican Mafia, which Cruz was, one of the inmates, or potentially Aryan Brotherhood, which was Lavender, the other inmate, and then you've got the third inmate, Cortez, who says, I'm a protected custody inmate. That's what's in the record. And you have Sergeant Hawthorne saying, yes, he was a protected custody inmate. You have a volatile mix there. Okay. And then how does Skoll know that? Well, Skoll knows that because Officer Smith says Skoll told him after the fact that, yeah, I knew that there was something going on. There were words being exchanged. Well, that's the harassing talk. But what about the protective custody status? Oh. Sergeant Hawthorne said that all the detention officers know that. And then he later was asked specifically, what about the correctional officers in general, and said, yes, they knew as well about the dangers of these inmates and about the protective custody business. So there's, you know, there's evidence there that reasonable jurors could say, okay, there's enough here. Well, I mean, do you have the Hawthorne deposition in front of you? No. But I do have. Or just, yeah, you just referenced some, well, they weren't quotes, because I can tell you, that testimony you're talking about is very ambiguous. So I wanted to know. Well, the site I have is ER-267 to ER-269. Yeah, that's what I'm looking at. And then ER-231 also, the prison investigative report about the Mexican mafia business and the Aryan Brotherhood as well. Okay. And you're saying that the, what's ER-231? Also ER-231, which is. Koenig investigative report? Yeah. Okay. And then the Sergeant Hawthorne testifying that he knew Cruz was classified as gang-related and an enforcer is ER-229. No, I know. But Hawthorne knew it is not particularly relevant for. But he also says that, he also explained that other correctional officers should have known that inmate Cruz was classified STG. That's ER-269. And Cortez himself saying that he was a protected segregation inmate was ER-229. So there are things in the record. What on 231, ER-231, I'm looking at it. It's this investigative report. What on that page says that Skoll should have or did know about the status of these inmates? I'm going to have to try to find that electronically. I just had a cite for my footnote. I mean, half of the thing is redacted. My copy. Thanks. Well, that's what I have from my cite there. That doesn't seem helpful. But the Hawthorne deposition testimony on ER-267 to 69, I mean, I understood the State's position to be, look, Hawthorne was talking about the detention officers, the real officers, not these visitation people who are somehow, you know, sort of less than real officers. And if unless you're able to persuade us, I think, that a reasonable jury could interpret Hawthorne's testimony as applying to everybody, you know, who worked at the detention unit. He did later testify that it was correctional, that the correctional officers knew. And I can see if I can find that cite when I sit down, and maybe that would be helpful. The fact that this was what Officer Skoll did, he escorted these inmates back and forth. I believe reasonable jurists could say, well, you knew or should have known that these are dangerous people. Well, he is a correctional officer. He's a CO2 correctional officer, level 2. So that would be some evidence from which the jury could make an inference. Counsel, it's Judge Gould with a question, please. So where I'm coming from on this, just to make it easier for you or for my colleagues, is that it seems to me that there is definitely a fact issue on negligence, and that that has to be reversed. And the appellee will argue that I'm wrong on that, and I'll listen. But unless I change my mind, I'm thinking that you win on negligence, that it goes to more proceedings. But on deliberate indifference, my understanding has been that this officer would have to be shown to be aware of the danger and to have disregarded it consciously. You can't really consciously disregard it if he's not aware of it. So if there's any place in the record that shows that he's aware of the danger of having the Nazi and the other gang members taking this protective custody guy through no man's land, you know, what's the specific evidence that would let a jury infer that he was aware of the danger and disregarded it? The specific evidence was Officer Smith's testimony that Skoll told him after the fact that he knew there had been words exchanged between these three inmates. There's general evidence that Officer Skoll knew it was a danger to be escorting three inmates alone. There's the prison policy that says when you're escorting inmates outside of the regular area in the no man's land, you need to have the wrist and the legs. That's background. Now, I understand on the other side, like everything else in this case, Officer Skoll says, well, the person who trained me said it's okay just to have the hand and wrist restraints, and I saw a written policy that said it's okay to do that, but they never produced that specific written policy, and they never called the deputy warden who supposedly had instigated that particular policy as a witness to say, yeah, there was a policy like that. So all you have is just a secondhand recollection. One thing about Officer Skoll that a jury really should consider is how believable he is. He gave this very strange, almost like kabuki-like description of the encounter. You know, at 1030, the fight starts. I call for help. At 1032, I spritz the two offenders one second burst. At 1033, I spritz them with one second burst. At 1034, I spritz them with one second burst. And all the time, I'm yelling at them, trying to get them to stop, and all the time, they're stomping and kicking on poor Cortez, who's down on the ground, helpless. So this is a very strange recollection of what happened. And then he says, well, the other officers arrived at the end of all this, and immediately the offending inmates stopped. But Sergeant Hawthorne says, well, no, that's not what happened. I was one of the responders, and we had to wrestle them down to the ground. I handwrote a report about it, which has apparently vanished. And when he was Officer Sergeant Hawthorne was presented a written, a typewritten report that had his signatory says, that's a forgery. I never did that, and I never signed it. So you've got Officer Sergeant Hawthorne saying one thing about how this all ended. You've got Skoll saying another thing. You've got Skoll doing things that he says you're not supposed to do. A reasonable jurist could say, you know, a pox on Skoll's house. He is not being truthful with us. And that's an important consideration when you're trying to decide who's right and who's wrong and whether there are genuine issues of material fact about knowledge. I think it would be a very rare case where a correctional officer would come in after the fact and say, I did it all wrong, and I'm at fault, and I was deliberately indifferent, and it was terrible, and I feel sorry about it. I mean, that case would settle. It wouldn't be here. But for cases that go into serious litigation and wind up at the court of appeals, you have to piece together things from bits and pieces and take all the inferences possible in favor of the nonmoving party. I would ask the Court's dispensation and an open mind in looking at the evidence and saying, well, what could reasonable jurists think about all of this stuff, all these differing accounts, and let this case go forward. Roberts. Okay. Well, we'll give you a couple minutes for rebuttal. Thank you. I appreciate it. Thank you. May it please the Court. Good morning. My name is Michael Gottfried. I'm an Arizona assistant attorney. I'm an officer of Skoll and the State of Arizona. Your Honor, there are no factual issues in this case. There are no inferences that can go any other way. What counsel is talking about is, frankly, speculation. He's talking about disbelieving evidence, which we can't do on summary judgment. Counsel, do you mean that argument that there's no issue relating to deliberate indifference or to negligence as well? Well, Your Honor. I'm having trouble seeing why there isn't evidence in a record from which a trier of fact could say that a reasonable standard of care wasn't followed. Your Honor, because the plaintiffs on appeal have only focused on Officer Skoll and nobody else. They're not talking about anything else that goes on in the prison system. If they ever made those arguments, they've waved it up here on appeal. And Supreme Court's made it clear, this Court's made it clear, that gross negligence isn't deliberate indifference. So if you have deliberate indifference, if you don't find, I'm sorry, if you don't find deliberate indifference, you can't find gross negligence. What case says that? Your Honor. That sounds backwards, what you just said. Deliberate indifference. If you don't find gross negligence, maybe you can't find deliberate indifference. You're right, Your Honor. But if you don't find deliberate indifference, there can still be negligence. You're right, Your Honor. And it's gross negligence. And the problem in this case is it's not negligence, it's gross negligence under Arizona law. Right. Okay. But I don't see why you can't. That's what they call it in Arizona. But it's still a question of degree and question of the standard of care. And at least, you know, subject to hearing the rest of your argument, like I'm thinking that it has to be tried against school on the negligence claim, although I think the deliberate indifference issue is a very difficult one. And I agree, Your Honor. In Arizona law, there's a case called Rourke that's cited in the material, and it's based on a Second Circuit case, which basically, well, specifically says that gross negligence and deliberate indifference are inextricably or closely intertwined. It's basically the exact same standard. And if you can't prove deliberate indifference, you really can't prove gross negligence, especially in this case, because under Arizona law, to prove gross negligence, you have to prove that the player, the person, had knowledge that there was going to be a serious substantial harm. And there's nothing, nothing in this record. Well, you can't say nothing. I mean, I hear what maybe you want to say that's not enough, but there's not nothing. Hawthorne's testimony could be read. Tell me why I'm wrong. I'm just going to say it, and you tell me why I'm wrong. Hawthorne's testimony could be read to say that all officers working in the detention unit, including someone of Skoll's rank, would know that each of the officers he was about to transport was there, you know, for a reason and not a good reason to mix them. So why is that? Why couldn't a jury reasonably infer that? Two reasons, Your Honor. First of all, it's especially in a deliberate indifference case. But the same with gross negligence. You can't infer a particular person's knowledge because one random officer says, oh, everybody should know that. That's just not the case. But everyone knew that this unit had people in it who were in it for a reason, whether it was that they were in a gang or whether they were protective custody. Whichever one it was, they were in there because they were more dangerous for some reason. That's not true, Your Honor. There were clearly people in there for disciplinary reasons, but there were also people in there when you request protective custody. And this is all undisputed. There's no fact issues about this. When you request protective custody, you're put in detention while the protective custody issue is determined. So all inmates are dangerous, but you have a mix of, like you do in the general population, dangerous inmates and not dangerous inmates. And disciplinary reasons can be for anything, for not taking your meal in the right order or not taking enough meals or turning down your meals. There's all kinds of reasons people are in there. Just like throughout the prison, there's all kinds of reasons people are – they're all dangerous. I mean, you can't – But they're in there because they're more dangerous or they need more security for some reason. Not necessarily, Your Honor. But certainly there's some people in there. But again, there's people there asking for protective custody, and it's being investigated. They're not necessarily more dangerous than anybody else. And again, there's people in there for just infractions along the way. So you have a mix like you have in the prison. But to answer your question, Judge Wadford, the other reason is that Officer Hawthorne was a detention unit officer. He works with those people all the time in the detention unit. He sees those prisoners all the time. Sure, he may know of their backgrounds and things like that. Visitation officer, like Officer Skoll, they – they work in the whole Morey unit, not in just the detention unit. So they're taking people from visitation from all over the place. I – I don't remember the number, but that's a huge number of people in the Morey unit. There's no reason on earth to believe that these officers who just show up in the morning and they're said, take Officer Inmate Jones, Inmate Smith, Inmate Roberts, go pick them up here and bring them over here. Well, hold on. I'm just looking again at Hawthorne's testimony. It's the same testimony that your opponent cited. And so he does reference correctional officers. And so you're saying that no reasonable jury could think that Skoll – Skoll, a correctional officer? You've got to be kidding. And why wouldn't? He works at the jail. Because, again, it's a huge amount of people. It's different – no, no reasonable juror could think that, Your Honor, that every correctional officer knows the background of every person that they're working with. But isn't that what Hawthorne is saying? And isn't that some evidence that a juror could credit? No, Your Honor. I don't think you can – I don't think you can generalize. So it's like saying every inmate is dangerous. But so because every inmate is dangerous, you can't do anything with them. You can't generalize when you're talking about deliberate indifference where it has to be his specific knowledge, Officer Skoll's specific knowledge. And him saying, I didn't know anything about these people. I just show up and bring them from place to place, you can't rebut that. You can't create a factual issue by some guy just saying, oh, gee whiz. So every officer – That's what you're telling us? Officer Skoll admits that he knew. That's the only evidence you're saying that could go to a jury because even if one of his colleagues says, oh, no, we all, all of us knew the status of these specific inmates, no jury could believe that over Skoll's denial. No. I think that's a totally different thing. I think if you had evidence that every one of the visitation officers goes in the morning and – But that he says every correctional officer would know at the status – and it's not just that these people are dangerous or that they're in there for a reason. He says specifically that Cortez was a PC inmate and Cruz was an STG inmate. But, Your Honor, the uncontradicted evidence from – in the record, the uncontradicted evidence is Cortez was not a PC inmate. Cortez had asked for protective custody. It's been denied, and he was in there for a disciplinary infraction. The uncontradicted evidence, no evidence whatsoever the other way, is that Cruz and Lavender were not STG-validated inmates. They may have been in the future, but they were in there for disciplinary reasons. They were not. So Officer Hawthorne is not only generalizing to the whole prison. He's wrong. He's absolutely factually wrong, and it's uncontradicted that he's factually wrong. So he's generalizing. So a reasonable jury couldn't believe this, because not only shouldn't you take a generalization and put – and make that a factual issue for a specific person, he's wrong. So from either direction, it cannot be a jury question. Okay? So – Counsel, could I ask a further question on – it's Arizona law, right? Gross negligence? Absolutely, Your Honor. Yes. We're dealing with Arizona law of gross negligence, not like New York law or something like that. So the question I have is, what is your best case that under the state law of gross negligence, something akin to deliberate indifference has to be shown? Wark, the case I mentioned, is an Arizona court of appeals case. It's 821 P. 2nd at 280. Wark cites to the Second Circuit case by saying that deliberate indifference and gross negligence are intertwined. And also just the definition of gross negligence in Arizona, that a person knows or has reason to know facts that a reasonable person believe creates both an unreasonable risk of bodily harm and a high possibility that substantial harm will result. It's basically knowing there's a danger out there like deliberate indifference and ignoring it. It's basically the same standard. So Wark preceded Braylord, I think is how you say it, right? And Braylord said a claim of deliberate indifference requires proof of more than gross negligence, and that's the same Arizona court of appeal. Wark, why don't we need to follow Braylord instead of Wark? Well, I think it does require more proof because I don't know what the more proof actually is, but all I'm saying is that they're very close. And in this situation, in this situation where there's no evidence that Officer It doesn't focus on any of the things that were going on in the prison system. With this evidence, and it's uncontradicted evidence, that he — there's no inferences that he didn't know. He didn't know anything about these people. He didn't know and wasn't responsible — or not didn't know. He wasn't responsible for putting on the shackles on their leg. On that point, the defendant for the gross negligence claim is the State. So a different officer didn't put on the extra set of shackles. Wouldn't that be part of the gross negligence claim? No, Your Honor. Just because they — they don't argue any of that in their briefs here up on appeal. All they argue about is Officer Scull. It says specifically in their questions presented to the Court that they're talking about one officer. This officer did this and this officer did that. They're not talking about the other officers. They're not talking anywhere about — and they make no arguments about any of the other things that could have happened out there in the prison system. They focused up here on appeal on that one officer and what he did or didn't do. Okay, just focusing on that one officer, could a reasonable jury infer that he knew that in this unit there were lots of dangerous people? Sure, Your Honor, but you could infer that for the whole prison system. Okay, that's — now, could he — could a jury infer that not putting leg irons on three people being moved at once would — would pose a danger? Not — it couldn't infer that this officer knew that, no, because this officer had experience in doing this before without any problems. He had experience in seeing other officers doing the same thing, transporting people for a period of two years without leg irons, without any problem, uncontradicted evidence, and under both deliberate indifference and Arizona's gross negligence. If a reasonable person looking at that and seeing there were — couldn't look at that for two years and infer that somebody could have a — a belief that created — that would create an unreasonable risk of bodily harm and a high probability that substantial harm will result, no, Your Honor, I don't think a reasonable jury could infer that. And I should mention one other thing. There's — there's — there's major evidentiary questions within the summary judgment or major procedural issues. For example, for gross negligence, Your Honor, in order to prove your prima facie case for gross negligence, if you're a plaintiff, you need to have expert testimony there in the record saying that there was a standard of care and the standard  That's not here in the record. They have an expert here, and he says this practice of taking more than this many inmates with one officer was a bad practice, right? Oh, Your Honor, there — there is an expert report. It's stapled on to the statement of facts. Statement of facts and the claims don't even refer to the expert report, except in one place, which I objected to in the record. The whole testimony, I guess, about standard of care is not part of this summary judgment proceeding. It wasn't put in their statement of facts. It wasn't forwarded. I wasn't given the chance to sit and take a specific fact and object to it or say it doesn't have foundation or whatever. It was just attached to the summary judgment proceeding. What do you mean by attached to the proceeding? Attached to the paperwork. It was just stapled on to the back and not referred to except for one section on one paragraph, and I objected to that. But the section that was referred to was not the standard of care. There's no evidence on the summary judgment proceeding before the district court or the magistrate judge that there was a standard of care that was fallen below here. Did you move for summary judgment on that ground? I moved for summary judgment, sure. But did you say the legal standard is that you need to have an expert and they don't have an expert, and did they have a chance to respond to that? I objected to their statement of facts saying that it wasn't included in the paperwork. But the district court rejected that procedural — I mean, the district court thought that their statement of facts was enough. Well, the district court didn't reject that. They rejected the other argument that, you know, I have a whole list of facts and none of them were designated as material facts of dispute. That was what the district court said. I'm not going to see — And did you move to get a ruling on this objection you're referring to now about the expert report? I was granted summary judgment, Your Honor. So I didn't — it was objected to and said it shouldn't be considered in the paperwork. It's on number 208. And what was your objection specifically? Within either their affirmative statement of facts in response to my summary judgment motion or in any of their objections to my statement of facts, they don't refer to anything in this expert report, including the standard of care, except for one paragraph which I objected to. On what ground? The paragraph, relevancy, foundation, a bunch of grounds. On the one paragraph from that report that they actually included in their statement of facts. And what I was basically saying, what the objection says is you can't just attach an expert report to your summary judgment response and have that used as evidence of anything. I mean, you have to somehow include it in your arguments, include it somewhere. There's not a word. They weren't moving for summary judgment. You were moving for summary judgment. They didn't have to prove that this was negligence or was deliberate indifference at this stage. They just had to show up. Well, how does it create a disputed fact? I mean, I certainly — if I sit there and say there's no evidence of X, Y, and Z, it didn't fall below the standard of care, how do they turn around and rebut that it didn't fall below the standard of care without putting evidence in themselves? But did you argue — so I think there may be two different ways of putting the standard of care. One is just a general standard of care. It sounds like you're now making an argument that there's a higher threshold here, that you need an expert to say what the standard of care is. Did you make that argument, that you need an expert in your summary judgment papers? I don't recall, Your Honor. And I don't think I actually did, because what I basically said is this conduct doesn't even get close to anything. But the fact is, to — to — for them to meet their burden, they still have to put forward evidence that there was a standard of care that was fallen beneath. But I don't think they have to say an expert report unless you, who you're moving for summary judgment, say they need an expert report and don't have one. If you don't say that, and you just say there's a standard of care, and they've put in evidence that they've met the standard of care point, then I don't see why they need to have done more with this expert report. There is no evidence that they met the standard of care. I guess that's what I'm saying. There's no — you need an expert to say you've met the standard of care, and they don't have any evidence that way. It doesn't sound like you made that argument, though. Okay. But I may not have. I may not have. Do — Judge Gould, any further questions for the — the State? I appreciated the spirited argument from the State and knowledgeable. And it's very helpful. Thanks. Thank you, Your Honor. I just believe — I still believe — do you want me not to talk anymore? You can make a concluding statement. I'll stop talking. You're over time, but I probably should be. I probably should be. Oh, is my time up? Your time — you're over your time. Oh, I'm sorry. I apologize. I was reading the clock wrong. Okay. I apologize. I just think we ought to look at qualified immunity also on the deliberate indifference claim, because there's no cases saying you should have done anything here. Thank you, Your Honor. Okay. Let's put three minutes on the clock for rebuttal. I was thinking more like 30. Yeah. You have a lot of ground to cover, I realize. I do. Actually, there were four points. If I can get some of that, it would be great. I would direct the Court's attention to ER236, and at the top, there is a summary of the comments that Correctional Officer 2 Smith made. Smith's important because he was Skoll's partner. The reason Skoll went off by himself was they had about 30 minutes until they had to do a prisoner count, and he needed to get these three prisoners out. Usually, it would be the two of them escorting, and instead, it was the one. The officer who put on the leg restraints was concerned, but he thought that it was two officers who were going to be taking them without the leg restraints, the ones who put the restraints on the way, so he was okay with the two officers doing it. He didn't realize it was just going to be Skoll by himself doing it. As far as gross negligence, on pages 16 and 17 of the reply brief, I refer to the three leading Arizona cases. One is Walls, and then the other is Armenta and Badia. I can give the sites, if the Court would like them. Okay. Well, the standard is actually very low. It's not a New York or a Philadelphia standard. I mean, in Arizona, we're a little bit more relaxed, maybe. But it's the public entity wouldn't be grossly negligent if it acts or fails to act when it knows or has reason to know facts that would lead a reasonable person to realize that its conduct not only creates an unreasonable risk of bodily harm to others, but also involves a high probability that substantial harm will result. It's a negligent standard with a little bit higher, but not much. The trial court only gets to resolve this as a matter of law if the plaintiff fails to produce evidence that is more than slight and that does not border on conjecture such that a reasonable trial fact could find gross negligence. You can only take the issue of gross negligence from the jury in Arizona when no evidence is introduced that would lead a reasonable person to find gross negligence. And then the final case talks about gross negligence being generally a question of fact for the jury. So the Arizona standard is not bad at all for gross negligence. And if that's what the case winds up with, we'll be happy to go forward with that. At least we'll get some sort of justice for the Cortez family. As far as the objection on the legal expert business, there wasn't one. There were a bunch of objections, and the defense did not press them, did not get a ruling on them. And in the end, the district judge let things go forward and made the ruling based on what had been presented to it. As far as standard of care expert business, there was no nothing about that. And you don't need one if reasonable jurors could qualify under the gross negligence standard. You simply don't need the expert. Kagan. I don't think he raised that argument. So could I ask you a different question? So what is your response to his point that Cortez was not actually a protective custody inmate? Do you think that's disputed? Well, we have two items to support that. Cortez himself says I was a protective segregation inmate. And Sergeant ---- Where does he say that? Could you just give us the page? If you want to give me a few more seconds, I can try to find that. Okay. The investigative report said that he expressed that he was the inmate. So that's the second volume of the record at ER 229 that Cortez specifically said that he was in fact a protective segregation inmate. Is it the greatest evidence in the world? You bet it's not. But it is something. And reasonable jurors could say, okay, we've got some indications that he's a protective custody inmate and some indications that he's not. And let's go in the jury room and talk about it. And that's really what it comes down to. This is a jury case, Your Honor. Have you been able to make your four points that you wanted to? Actually, I think I did. Okay. Then I have one question. Hopefully this can be the last question. Just about the Smith. I'll stay here forever if you want me to. I'm happy to. No. You referenced ER 236. And you're right. At the very top of that page, there's a reference to Smith's statement. I guess I'm trying to wrestle with the more or less an evidentiary objection that the State raised to your reliance on that. Because we do have an actual statement from Smith that is, I think he would say, that clarifies that he wasn't talking about contemporaneous knowledge on Skoll's part. Skoll found out about it after the fact. And I just am trying to look at this and figure out, well, how could this be admissible evidence of, you know, I mean, how would you even impeach Smith's testimony that's consistent with his declaration with this investigative report? Well, Smith would be pretty easy. Officer Smith, didn't you say X, Y, Z at one point? And you changed it later on. Well, why did you change it? And isn't it true that you did say at one time this was so and at another time this was so? Well, but the ER 236 reference says nothing about the time. That's what I'm saying. It just — Nothing about — Are you looking at it? I mean, it's — Oh. Why don't you get it in front of you? It's not specific as to the timing as to when Skoll learned that there was a lot of — what it says is a lot of talk and harassing words between the three inmates in the back cage. Right. Officer Smith learned that from Officer Skoll. And how did Officer Skoll learn that? A reasonable inference is he learned that because he saw it and or heard it. No. The defense says there are auditory problems. You can't hear things. Well, you know, you don't have to — there's certain words that are spoken emphatically. You don't have to be a lip reader to know what they are. Just watch any baseball game and watch the managers. You know exactly what they're saying. So, you know, Smith is saying that Skoll told him that there were bad words being spoken at that area. And Skoll, I assume, knew that because he saw it happen or heard it happen or both. You know, and you also got some testimony from Cruz himself. Cruz is just spewing a lot of badness out of him after this incident. And he's saying that, yeah, we were going back and forth, and Cortez was bragging that he's in protective segregation. See, there's another item of evidence of protective segregation. Cortez is bragging about this, and he's saying that you guys are clowns. You know, Cortez doesn't have a lot of common sense, obviously. I mean, you don't antagonize these kinds of people, but, you know, that's not — they're not raising a comparative fault question here, thank God. Yeah. Let me just — I'm sorry, one more question about Smith. Smith's declaration, he says very clearly that the information that you just talked about that he got from Skoll, Skoll told him that he didn't find out about that until after the incident because he — Skoll was kind of wondering, well, how — why in the world did this happen? And someone told him after the fact that, oh, well, didn't — you know, there actually was this dispute going on. Yeah. But that's later on in a separate part. Skoll is going back and forth all the time. One inmate — two inmates per guard is the maximum. No, no, three is fine. The fight — It has to do with the credibility of Smith, not Skoll. Well, credibility of Smith and Skoll would both be at issue. And he is an agent of the State. Certainly, he's an agent of a party opponent. This has inherent — there are no questions about whether that necessarily was true or not true, but simply that it occurred. You know, it's not saying that they actually said specific words, but that some sort of words were going on. Something bad was happening. And I think that that elevates it and takes us to the past, the point of hearsay, where we would be able to get it in. And, you know, it would actually be fairly straightforward as a trial lawyer. You'd call Smith to the stand and interrogate him to the — And Smith's declaration doesn't actually say that Skoll learned after about the harassing words, does it? It just says that his earlier statement was consistent with the idea that it could have been after. It doesn't actually say, he told me he didn't learn until after. It is not the greatest evidence in the world, but it could — but it does lead to a reasonable inference. And reason — and that's all we're asking for, is the opportunity for reasonable jurors to — to get — to take those sorts of inferences. As I say, this is one of those cases that gives you a nightmare in a certain sense because every time you think you've got something in your hand, in the other hand, you've got something else. But that's a classic jury trial. Okay. Let's stop there. We appreciate both sides' arguments. I'm so grateful. Thank you very much for the time. Yes. These were very helpful. And we appreciate your — your arguments. Yes, sir. The case just argued will be submitted, and this Court now stands in recess until tomorrow.
judges: Gould, Watford, Friedland